LASSER, P.J.T.C.
Taxpayer contests the 1986 local property tax assessments on 122.287 acres of vacant land known as Block 4438, Lot 1 and Lot 1.1, located in Bridgewater Township in the triangle created by the intersection of Routes 202/206, 22 and 287. Lot 1 is 81.847 acres in size and is zoned for regional shopping center use, and Lot 1.1 is 40.44 acres in size and is zoned for office and *585 hotel use. They are contiguous and constitute the land upon which the Bridgewater Commons project is being developed. The 1986 assessments are:
Lot 1 Lot 1.1
Land $11,458,600 $7,071,900
Total $11,458,600 $7,071,900
The 1986 tax rate is $1,883 per $100 of assessed valuation. Only valuation is in issue. In 1986 the entire taxing district was revalued, and the parties have stipulated that 100% is the applicable ratio of assessment to market value. Taxpayer contests the assessments directly to the Tax Court pursuant to N.J.S.A. 54:3-21. Taxing district has not filed a counterclaim.
EWH 1979 Development Company, L.P. (EWH), a California limited partnership in which Ernest W. Hahn, Inc. was the general partner, purchased the subject property from the Bridgewater Redevelopment Agency (Bridgewater), an agency of Bridgewater Township, for the purpose of developing the property as a regional shopping center, offices and a hotel, in accordance with a plan of development set forth in the agreement of sale originally entered into July 19, 1979, as amended from time to time, with the final amendment dated April 27, 1985. The original contract was for the sale of 81.8 acres. The balance of 40.44 acres was added by the April 27, 1985 amendment. The purchase price in the July 1979 agreement was $5,251,700. The April 1985 amendment added $3,500,000 to the purchase price, for a total price of $8,751,700, or $71,567 an acre for the 122.287 acres. The agreement of sale contained restrictions on the use of the property and requirements for expenditures to be made by the developer for the benefit of the taxing district. Principal among these restrictions and requirements are:
1. The shopping center is limited to 900,000 square feet of gross leasable area, with no more than three major tenants.
2. The developer is required to construct one or more office buildings with a maximum of 300,000 square feet of gross *586 leasable area, with a possible increase to 500,000 square feet of gross leasable area.
3. The developer is required to construct a hotel of not more than 300 rooms, with a conference center having no more than 33,000 square feet.
4. The developer is required to provide roads and bridges for the improvement of Routes 202/206 and 287 (off-site improvements), at an estimated cost of approximately $20,000,000.
5. The developer is to provide Bridgewater with a $10,000,-000 letter of credit to secure obligations to build the off-site improvements. If the off-site improvements cost less than $20,000,000, the difference is to be paid by the developer to Bridgewater.
6. Bridgewater is to receive 15% of all overage rent on the shopping center. The parties defined overage rent as all annual rent in excess of the minimum and percentage rents paid during the first twelve months following the “grand opening,” except for department stores.
7. Bridgewater is to receive 2.333% of the net profits from the first 300,000 square feet of gross leasable office area.
8. The developer is to pay Bridgewater $80,000 to study and/or fund a mass transit system to serve the project and other areas of Somerset County, and thereafter make annual payments of $20,000 as a subsidy.
9. The developer is to construct a community facility, costing approximately $200,000, and the developer is to pay Bridge-water $290,000 on April 27, 1985.
10. The developer is to pay the cost, not to exceed $400,000, of a resident project coordinator selected by Bridgewater.
11. The developer is to pay Bridgewater amounts equal to the real estate taxes that would have been payable each year if the land had been privately owned from 1979 and valued at $6,600,000.
12. The developer may not sell, transfer or assign any portion of the property until the project is completed.
*587 13. The developer may not mortgage the project prior to completion.
14. Construction of phase I (shopping center) of the project must begin by March 1, 1986, phase II (office area) by October 1, 1988 and phase III (hotel and conference center) by October 1, 1990.
Other requirements of the agreement primarily set forth obligations that are normal for the development of a project of this size and scope and include provisions for the construction of roadways and walkways, protection of wetlands, floodlands and the environment, parking ratios and maintenance of roads and facilities.
Most of the off-site improvements are to be owned by the State of New Jersey. The former township engineer, now Bridgewater’s resident project coordinator, testified that approximately one-third of these off-site improvements will not benefit the subject property.
The subject property, known in the area as the “golden triangle,” had been acquired by Bridgewater to enable the taxing district to direct its development. The property had been under study for some time, with the ultimate determination that it should be developed as a mixed-use regional shopping center.
Physical development of the property commenced in 1986, with a substantial amount of construction activity devoted to improvement of the road network in the area, as required by the purchase contract. The shopping center portion of Bridge-water Commons is scheduled to be completed during 1988. As of the trial date, construction had not yet commenced on the office building or hotel phases.
On October 17, 1986 EWH sold a 50% interest in the project at a price equal to one-half of the costs expended on the project *588 to September 30, 1986.[1] The total aggregate cost as of that date was $38,839,668. A summary of the total costs as of September 30, 1985 and September 30, 1986, as furnished by taxpayer to Bridgewater, follows:
Aggregate Cost—Bridgewater Commons
September 30, 1985 September 30, 1986
Land 6,789,245 [2] 7,151,684 [2]
Construction 92,620 9,351,974
Building owner 12.593 265,525
Consultants 3,430,700 5,438,650
Legal fees 1,005,107 1,218,965
Real estate taxes 1,495,368 1,777,300
Project administration 636,935 955,563
Advertising & promotion 89.594 212,276
Other cost 3,920,000 3,920,000
Financing 5,357,472 8,488,413
Leasing 59,318
Total aggregate cost 22,829,634 38,839,668
The purchaser rejected dues and convention expenses of $177,800 included in the above figures, which reduced the basis for its 50% contribution to one-half of $38,661,868.
The cost of on-site improvements as of October 1, 1986 was reported to the assessor as follows:
*589 Site improvements $2,483,589
Foundations 1,004,520
Structural steel 994,630
Miscellaneous 197,464
Change orders 4,212
Total $4,684,315
I.
Taxpayer’s appraisal expert, using the sales comparison approach, relied principally on the sale of the subject property at $8,751,700 ($71,567 an acre) (sale # 1) and the sale to AT & T Information Services, Inc. of a 186.2-acre parcel of property located at the intersection of Routes 78, 202/206 and 287, approximately four miles north of the subject property, for office building use (sale # 2).
Although this expert did not have complete information on the AT & T sale, he estimated the sale price at $32,585,000, or $175,000 an acre. The expert deducted 10% from the sale price because AT & T was “highly motivated,” and therefore, in the expert’s opinion, paid a price in excess of market value. He made an upward adjustment of 3.7%, using the Comsumer Price Index, for the time differential between the sale date and the October 1, 1985 assessing date, which he testified was ten months. Then he deducted 10% because, he stated, the subject property lacked the visibility and accessibility of the AT & T property. He then added back the per-acre price of off-site improvements because “the buyer apparently agreed to provide $6,000,000 of off-site improvements or $32,223 an acre (based on 186.2 acres),” and he then decreased the per-acre figure because the EWH property requires $20,000,000 of off-site improvements as compared to $6,000,000 for the AT & T property. He discounted this figure for the period of construction ($20,000,000 discounted for 18 months at 11.7% = $16,915,-544, or $138,327 an acre) and deducted $32,223 an acre of AT & T off-site improvements, for a net decrease adjustment of $106,104 an acre. From these adjustments he concluded that, *590 based on the AT & T sale, the value of the subject is $73,114 an acre or $8,950,000 (rounded). His calculations follow:
AT&T purchase price per acre $ 175,000
Less 10% for highly motivated buyer 17,500
Plus 3.7% time adjustment 5,827
Less 10% for greater visibility and better access 16,332
Plus agreed off-site improvements 32,223
Less required off-site improvements of the subject property 106,104
Net adjusted per-acre purchase price of the subject 73,114
Total adjusted purchase price of the subject ($73,114 X 122.287 acres) $8,940,892
This witness testified to three additional sales, two in Bridge-water (sales #’s 3 and 4) and one in Bernards Township (sale # 5). One is zoned for manufacturing and two are zoned for office buildings. These three sales, occurring between April 1984 and March 1985, of parcels ranging in size from approximately 27 to 30 acres and reflecting per-acre sale prices in the $135,000-$145,000 range, were given very little weight by this expert because the parcels of land were smaller, the properties and their permitted uses were not the same, and this expert may not have had available all of the facts regarding at least one of these three sales.
This expert testified that he gave the greatest weight to the sale of the subject property from Bridgewater to EWH on April 27, 1985, gave some weight to the sale to AT & T Information Services, Inc. and used the three additional sales only to indicate the maximum value per acre. He stated that smaller parcels tend to sell for higher per-acre prices, and therefore the 122-acre subject property would sell for less an acre than these three properties. This expert also gave some consideration to the October 17, 1986 sale of the joint venture interest in the development of the subject property. This sale of a 50% interest in the joint venture, he testified, priced the entire project at $38,661,868 one year after the assessing date but included the land at its $8,751,700 cash purchase price.
*591 From the foregoing, taxpayer’s appraisal expert valued the property as undeveloped land at $8,800,000. He stated that this figure reflected his opinion of value of the land encumbered by the requirements and restrictions imposed by Bridgewater.
This expert was of the opinion that the uses set forth in the development plan for the subject property represented the highest and best use of the property.
II.
Taxing district’s appraisal expert agreed that the development plan for the property was its highest and best use. Like taxpayer’s expert, this expert also relied solely on the sales comparison approach. However, unlike taxpayer’s expert, taxing district’s expert distinguishes between retail, hotel and office use and values each portion of the land based on its planned use. This expert considered the 1979-1985 sale of the subject property and the sale, one year after the assessing date, of a 50% joint venture interest in the project, as well as 14 other sales. These 14 sales were divided into three categories. Four were for retail use, three were for hotel use and seven were for office building use.
The four retail use sales occurred between October 1984 and December 1986, and were of properties located in Edison, North Brunswick, East Brunswick and Bedminster. These properties ranged in size from 10.43 to 37.29 acres and in price from $1,800,000 to $10,100,000. These sales produced per-acre sale prices ranging from $80,400 to $313,300.
The three hotel sales occurred between July 1983 and March 1987. Two of the properties were located in South Brunswick and one was in Hanover Township, and they ranged in size from 7.35 to 13.52 acres, in price from $1,658,000 to $2,700,000 and in price per acre from $200,000 to $301,100.
The office building land sales occurred between April 1984 and December 1985. Two properties were located in Bridgewater, one in both Bridgewater and Bedminister, one in Parsippany, one in Edison, one in Woodbridge and one in Franklin *592 Township. The sale parcels ranged in size from 18.23 to 186.2 acres, in price from $3,500,000 to $27,390,496 and in price per acre from $111,800 to $304,000.
A summary of the fourteen sales follows:
Sale Size No. Date Location Use in acres Price Price per acre Unit price
1 10/04/84 Edison retail 22.39 $ 1,800,000 $ 80,400 $ 10.001
2 02/18/86 No. Brunswick retail 37.29 (Route 1) 7,000,000 187,700
3 06/12/86 E. Brunswick retail 10.43 (Route 18) 1.915.000 183,600 17.50 J
4 12/10/86 Bedminster retail 32.23 (Routes 202/206) & office 10,100,000 313,300 29.00 4
5 07/22/83 Hanover Tp. hotel 13.52 (Route 10) 2.700.000 200,000 7,650.00 3
6 10/31/84 So. Brunswick hotel 8.29 (Route 1) 1.658.000 200,000 7,970.00 0
7 03/12/87 So. Brunswick hotel 7.35 (Route 1) 2.213.000 301,100 12,000.00 J
8 04/05/84 Bridgewater office 26.94 3.500.000 129,900 11.50 4
(9 04/30/84 Bridgewater office 40.01 7.800.000 195.000 19.50 4)
( (Rts. 202/206) .)
(9A 03/01/85 Bridgewater office 146.19 19,590,496 * 134.000 23.00 4)
( (Rts. 202/206)
( & Bedminster
(#9 & 9A same as taxpayer’s sale # 2—AT&T sale)
10 06/29/84 Bridgewater office 27.3 (Route 22) 3,750,000 137,500 12.50 H
(#10 same as taxpayer’s sale # 3)
11 09/19/84 Parsippany office 122.32 19,800,000 176,300 11.35*
12 11/20/84 Edison office 24.79 6.150.000 248,000 12.00
13 08/08/85 Woodbridge office 18.23 5.540.000 304,000 10.25
14 12/03/85 Franklin Tp. office 132.93 14,859,824 111,800 not given
* The per-acre average for sales 9 and 9A is $157,100 per acre, including a credit of $1,861,000 for an assumption of part of the seller’s off-site obligations.
1 Land price per square foot of retail space
2 Land price per square foot of building
3 Land price per hotel room
4 Land price per square foot of office space
This expert’s opinion of the value of the subject property based on his analysis of these 14 sales is:
*593 Lot 1 (shopping center)
900,000 square feet of retail space on
81.8 acres at $175,000/aere or $14,315,000
13,500,000 at $15/square foot
Estimated value $14,000,000
Lot 1.1 (office & hotel)
500,000 square feet of office space on
25.141 acres at $200,000/acre or 5,028,200
at $10/square foot 5,000,000
$5,000,000
300 room hotel on 15.299 acres
at $200,000/acre or 3,059,800
at $10,000/room 3,000,000
3,000,000
Estimated value 8,000,000
Total estimated value $22,000,000
This expert stated that the sale of the 50% joint venture interest in the project confirmed his opinion of value. He stated that one year after the October 1, 1985 assessing date the 50% interest sold on the basis of a total cost of $38,661,868. Excluding $4,684,315 expended for improvements between October 1, 1985 and October 1, 1986 and excluding $1,000,000 for other land not the subject of his appraisal indicated to this expert a cost for the subject land as of October 1, 1986 of $32,977,553.
In arriving at his opinion of value, this expert stated that the subject has better visibility and access than any of the comparable sale properties and has a size which permits it to dominate the market. This expert analyzed the comparable sales of land by sale price per acre, sale price per square foot of retail space, sale price per square foot of building, sale price per square foot of office space and sale price per hotel room. He testified that the larger size of the subject property did not warrant any reduction in the sale price per acre because the highest and best use of the subject is for a regional shopping center, and the full 122 acres are necessary for a regional shopping center, offices and hotel and other improvements required by the development plan. He opined that if it had been necessary for the developer to assemble a parcel of this size, the assembly costs would *594 offset any volume discount that might be attributable to the large size of the parcel.
III.
The quest is for the value of the subject 122.287 acres of land as of the October 1, 1985 assessing date. The burden of establishing the value of the property is on the party contesting the assessment who must prove, by a preponderance of the evidence, that the assessed value is incorrect. WCI-Westinghouse, Inc. v. Edison Tp., 7 N.J. Tax 610, 617 (Tax Ct.1985), aff’d 9 N.J.Tax 86 (App.Div.1986); Newark v. Cedar Grove Tp., 7 N.J. Tax 66, 78 (Tax Ct.1984).
The appraisal experts have estimated value based on the sale of the subject and sales of comparable parcels of vacant land. Taxpayer’s expert relied most heavily on the sale of the subject from Bridgewater to EWH, concluding that the property has an October 1, 1985 value of $8,800,000 ($71,962 an acre). The expert for the taxing district estimated the value of the subject by analyzing land sales for retail, office and hotel use and concluded that the October 1, 1985 value is $22,000,000 ($175,-000 an acre for retail area and $200,000 an acre for office and hotel area). The 1986 assessments of the subject total $18,530,-500 ($151,533 an acre), which is allocated $140,000 an acre for the shopping center land and approximately $175,000 an acre for the office and hotel land.

A.

The Sale Of The Subject As Evidence Of Value.

The subject property is singularly unique in New Jersey. On the assessing date it was vacant and available for immediate development as a regional shopping center, offices and a hotel. Zoning was not a concern.
Taxpayer’s expert’s opinion that the value of the property is $8,800,000 is based primarily on the cash consideration portion *595 of the 1979 agreement, as amended in 1985.[3] His knowledge of the details of his other sales was incomplete and therefore, to the extent relied on, his conclusions with respect to these sales are unconvincing. His failure to include the non-cash obligations incurred by EWH when he estimated the value is a fatal flaw in his reasoning.
The entire sale transaction must be analyzed. All of the terms of the sale must be considered—not just the cash consideration paid by the purchaser. The purchaser bought a package—land zoned for the purchaser’s intended use. The seller negotiated for and received from the purchaser other valuable consideration in addition to cash. To the extent that this non-cash consideration can be valued, and to the extent that it is part of the price paid for the land, the non-cash consideration must be included in the sale price. The price includes the following additional obligations undertaken by the purchaser:
1. To expend $20,000,000 to improve the roads and bridges on Routes 22, 202/206 and 287 (off-site improvements).
2. To pay Bridgewater $80,000 for a mass transit study, and thereafter to make annual payments to Bridgewater of $20,000 as a mass transit subsidy.
3. To construct a $200,000 community facility in the Bridge-water Commons and to pay $290,000 to Bridgewater.
4. To pay the cost of a resident project coordinator selected by Bridgewater, not to exceed $400,000.
5. To make payments to Bridgewater of sums equal to the real estate taxes that would have been payable if the land had been privately owned from 1979, at applicable tax rates, based on an assessment of $6,600,000.
6. To pay Bridgewater 15% of all shopping center overage rent. Overage rent is all annual rent in excess of the original *596 minimum stabilized rents paid in the first year, except for department stores.
7. To pay Bridgewater 2.333% of the net profits from the rental of the first 300,000 square feet of gross leasable office space.
Taxpayer contends that: (1) these purchaser-obligations are all attributable to improvements to be built in the future, and they do not increase the land cost or the land value on the assessing date; (2) the use restrictions adversely affect the value of the subject, and (3) a large parcel such as the subject will sell for less than a smaller parcel on a per-acre basis.
Taxpayer argues that the $20,000,000 obligation to construct off-site improvements does not constitute a part of the sale price of the land.[4] Taxpayer contends that the cost of future off-site improvements should not be added to, or deducted from, the land price to reflect the land value on the assessing date because these improvements do not add value to the land until they have been made, and the necessity of making these improvements is taken into consideration by knowledgeable buyers and sellers and is reflected in the cash purchase price.
The cost of off-site improvements required by the seller in the sale contract and which do not benefit the property must be added to the price paid for the land because they are an additional non-cash consideration paid for the land for which the buyer can expect no future increment in value or return. The same treatment applies to required on-site improvements which do not benefit the property but which are in addition to improvements customarily required by a municipality, such as utilities, paving, curbing, retention basins, etc. Reasonably necessary on-site and off-site improvements occasioned by the development of the property can be exacted from a developer by a municipality under New Jersey Builders Assoc. v. Bernards Tp., 108 N.J. 223 (1987). The cost of such improvements *597 may not represent additional consideration. However, the present case is not one where a zoning or planning board is requiring a developer to make off-site improvements, nor has any evidence been presented establishing that the subject non-benefiting improvement costs could legally have been imposed by the township if Bridgewater had not been the seller. Therefore, the value of the non-cash consideration representing improvements required by the seller but not benefiting the land must be added to the cash price to determine the purchase price of the land.
In the subject case there is uncontroverted testimony that approximately one-third of the $20,000,000 cost of off-site improvements does not benefit the land. Therefore, that portion of the cost is an obligation which will not be reflected in the value of the land, and it must be included as part of the purchase price of the land. Even though the improvements were not in place on the assessing date, there was an obligation by the purchaser to make these non-benefiting improvements, and this obligation was part of the consideration paid for the land. On the other hand, improvements which do benefit the subject property are not part of the purchase price paid for the land because those improvements, when made, add value to the subject property.[5]
The $400,000 cost of the resident project coordinator, Bridgewater’s representative monitoring the project, must be included as part of the purchase price because there is no evidence that his efforts will benefit the property, and therefore this obligation is part of the consideration paid for the land. A purchaser would plan on the entire $400,000 being expended.
I do not include in the purchase price of the land the obligation to pay a percentage of overage rent for the regional *598 shopping center and office space as a part of the non-cash consideration. Attribution of a value to this obligation is too speculative since it depends on the construction and rental of the buildings and the future appreciation of the rental income.
The purchaser agreed to pay the seller an amount equal to the real property taxes that would have been payable each year if the property had been privately owned since 1979 and valued at $6,600,000. A purchaser is not obligated to pay real estate taxes until he acquires title to the property. The obligation to make this payment to the municipality for the period during which the municipality owned the property is an obligation incurred as a part of the purchase agreement and thus is to be included in the total price of the land.
The cash and non-cash consideration paid or incurred by EWH includes:
Cash payment $ 8,751,700
Payments in lieu of taxes 1,005,808[6]
Mass transit study 80,000
Required off-site improvements which do not benefit the subject property 6,666,667 [7]
('/a of $20,000,000)
Community facility cost & payments 490,000
Resident project coordinator 400,000
Total (not including $20,000 annual mass transit subsidy for an unlimited period of time) $17,394,175
In addition to the cash and non-cash obligations under the agreement, EWH made substantial expenditures to develop the property prior to October 1, 1985. These development costs *599 alone totaled over $16,000,000 as of September 30, 1985 ($22,-829,634 total cost less $6,789,245 payment for land). There is insufficient evidence for the court to determine what portion of these expenditures translated into increased land value on the assessment date. A purchaser may pay more for land which has received the benefit of the expenditure of development costs, and these development costs may have resulted in an increased land value as of the assessing date.
In view of the fact that the cash and non-cash considerations together make up the total purchase price, I find that the sale of the subject indicates a value substantially in excess of taxpayer’s expert’s estimate of $8,800,000, and more likely supports the 1986 assessments.

B.

The AT & T Sale As Evidence Of Value.

Both experts relied in part on the sale to AT & T Information Systems, Inc. of a 186.2-acre parcel at the intersection of Routes 202/206 and 287. This land is similar to the subject. Both are in prominent locations. The two properties are on Routes 202/206/287, approximately four miles apart, with the subject at the intersection with Route 22 and the AT & T property at the intersection with Route 78. Both have a brook running through the property and both have a portion of the property within the 100-year flood plain and flood way. Both required extensive off-site improvements. Although the AT & T purchase was for office building use only, while the subject was for combined regional shopping center, office and hotel use, the AT & T sale gives a good indication of the value of commercial land in the area.
Taxing district’s expert testified that the sale of a 40.01-acre portion of the AT & T property occurred in April 1984 and the remaining 146.19 acres were purchased in March 1985 pursuant to an option granted in April 1984. He testified that the sale price averaged $157,100 an acre for the two tracts (taxpayer’s expert estimated the purchase price at $32,585,000, or $175,000 *600 an acre). Since taxpayer’s expert concededly was unaware of a number of details with respect to the AT & T property and its sale, I accept taxing district’s expert’s recital of the facts of this sale and his conclusion that the per-acre price for the 186.2-acre purchase averaged $157,100. An upward adjustment of the $157,100 per-acre price by a conservative 12% for time for the 18-month period from April 1984 to October 1985 indicates a value for the subject of $175,952 an acre.[8]
Given the desirability of the subject and the AT & T property, I cannot discern a difference in degree of motivation between the two buyers, and therefore find no justification for taxpayer’s expert’s 10% downward adjustment because AT & T was a “highly motivated” purchaser. I also find that the properties are comparable in location and, therefore, taxpayer’s expert’s 10% downward adjustment based on location of the subject is not warranted.
In reaching a per-acre price for the subject based on the comparable AT & T sale, taxpayer’s expert makes incorrect adjustments for off-site improvements. The sales comparison approach is an appraisal technique “which is based upon the proposition that an informed purchaser would pay no more for a property than the cost to him of acquiring an existing property with the same utility.” Boyce, Real Estate Appraisal Terminology (1975) at 67. When using this method, an appraiser begins with the sale prices of comparable properties which have recently been sold. Then, the appraiser makes adjustments to the price of each comparable sale property to reflect the differences between the comparable sale property and the property to be valued. In land valuation, adjustments are made for differences such as location, physical characteristics and time. After adjustments, the resulting adjusted sale price is the price that reflects, as accurately as possible, the *601 price for which the property to be valued would sell on the date of appraisal. The adjusted sale price is thus a value indication for the subject property. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) at 319-320. Adjustments are only appropriate for those characteristics that are different and therefore cause the price to change. The $20,000,000 cost of off-site improvements does not cause the price of the subject to change. Two-thirds of this cost represents improvements which will benefit the subject property and will be reflected in the property value when made, but will not cause the price at the time of purchase to change. One-third of this $20,000,000 cost represents improvements that will not benefit the property and is therefore a part of the non-cash portion of the land purchase price. However, the fact that the price paid for the property is not all cash but is partly cash and partly the assumption of obligations which do not benefit the property (the one-third portion) does not cause the total purchase price or the value to change. It is therefore improper, when using the sales comparison approach to determine value, to deduct from the AT & T sale price any portion of the $20,000,000 cost of improvements to the subject property.
From the AT & T sale price, I find that land zoned for office-building use comparable to the subject has a value of $175,000 an acre. Taxing district’s expert testified that land for shopping-center use has a per-acre value that is $25,000 less than land for office and hotel use, and this testimony is uncontroverted.
Taxpayer argues that the use restrictions imposed by Bridge-water limit the market and therefore the value of the property when, in fact, Bridgewater’s use restrictions facilitate what is the highest and best use for a parcel of this size and location. The cash and non-cash consideration reflects the value of the land subject to these restrictions. With regard to taxpayer’s argument that the land value must be discounted for size, the AT & T sale indicates no justification for discounting for size.
*602 From my examination of the sale of the subject to EWH and the AT & T sale and taking into consideration the other sales testified to by taxing district’s expert, I cannot accept taxpayer’s expert’s opinion of value of the subject of $8,800,000 ($72,000 an acre), which he based on the cash consideration portion of the 1979-1985 sale of the subject property and his analysis of the AT & T sale.
I therefore conclude that taxpayer has not met its burden of establishing by a preponderance of the evidence that the value of the shopping center land is less than the assessed value of $140,000 an acre and the value of the office and hotel land is less than the assessed value of $175,000 an acre. The Clerk of the Tax Court is directed to enter judgment affirming the 1986 assessments.

The sale was effected by a transfer of the subject property from EWH to Bridgewater Commons Associates, a partnership in which EWH retained a 50% interest. The consideration stated in the deeds was:
81.844 acres $19,000,000
25.141 " 7.000. 000
15.299 " 3.000. 000
Total $29,000,000
In a separate action the purchaser seeks a refund of realty transfer tax, contending that only a part of the purchase price was for real estate.

There is no explanation why these figures differ from the $8,751,700 cash purchase price.

The fact that the sale was first made in 1979 for 81.8 acres and revised in April 1985 to add 40.4 acres raises a question as to whether the sale price reflects the value as of October 1, 1985.

This contention appears to be inconsistent with this expert’s addition of the cost of AT & T off-site improvements to the AT & T sale price.

In Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481, 515-516 (Tax Ct.1983), the court held that, when constructed, the cost of a highway overpass, which benefited a shopping mall property because it provided access, must be included when determining value using the cost approach.

This figure was furnished by counsel after trial, at the court’s request.

If a discounted figure of $16,915,544 were used, one-third would be $5,638,-515, reducing the $17,394,175 total to $16,366,023 before adding a figure for the $20,000 annual transit subsidy and for development costs expended which affect land value.

Taxpayer’s expert used the Consumer Price Index to adjust for time. The change in the Consumer Price Index from April 1984 to October 1985 was + 18.7% for New York and northeastern New Jersey and + 17.2% for "U.S. City” average.